## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| DEBRA A. and GERALD J. BUDNER and MARIE ACKERMAN, individually and on behalf of all others similarly situated, | ) ) ) ) | |
| Plaintiffs, | ) | No. 3-06 CV-0329-K |
| v. | ) ) | ECF |
| WELLNESS INTERNATIONAL NETWORK, LTD., a Texas limited partnership A/K/A/ WIN, WIN NETWORK, INC. a Colorado corporation, RALPH OATS, CATHY OATS and SHERI MATTHEWS, individuals, | ) ) ) ) ) ) | Jury Trial Demanded |
| Defendants. | | |

## FIRST AMENDED CLASS ACTION COMPLAINT

**Prefatory Note:**   This case was originally filed as a class action in the United States District Court for the Northern District of Illinois on March 24, 2003.  On July 8, 2003, the court granted defendants' motion to compel arbitration and to stay and abate litigation.  A classwide arbitration claim was filed by plaintiffs with AAA, and on December 20, 2004, the arbitrator (former Utah Supreme Court Chief Justice Michael D. Zimmerman) issued his partial final clause construction award, ruling that the claims must be "removed to state or federal court in Dallas, Texas" and stayed his ruling 45 days to give the parties time to appeal.  On February 2, 2005, defendants filed their Application and Appeal to Partially Vacate Arbitration Award in the Northern District of Texas, Case No. 3:05-cv-0237-B, assigned to Judge Jayne J. Boyle.  The next day, Justice Zimmerman issued another stay order, to wit, "that further proceedings in the matter are stayed until five working days after the arbitrator is informed of the ruling of the court on the effort to have the award overturned in whole or in part." On December 14, 2005 counsel for defendants sent a letter to the AAA informing them of, and enclosing a copy of, Judge Boyle's ruling that had been issued in August of 2005, denying their appeal.  This was the first information plaintiffs or their counsel received of the district court order.   On February 21, 2006, the instant suit was filed.

Plaintiffs, by their undersigned attorneys, for their class action complaint allege as follows upon personal knowledge as to themselves and their own acts and experiences, and, as to all other matters, upon information and belief, including investigation conducted by their attorneys:

## NATURE OF THE CASE

1.      Defendants Ralph Oats, Cathy Oats and Sheri Matthews, through Wellness International Network, Ltd. (hereinafter "Wellness") and WIN Network, Inc.  (hereinafter "WIN") (collectively "Defendants"), conduct a multimillion dollar fraudulent operation from coast to coast, including in Illinois, through Wellness's so-called "multi-level marketing" ("MLM") network that is actually a classic unlawful pyramid scheme, in violation of both the criminal and civil laws of Illinois and of the United States.

2.      Their operation involves, among other things, encumbering plaintiffs and other victims with unlawful pyramid investment contracts that are legally void and as solicited and exploited by the defendants, entirely fraudulent and unconscionable.  It also involves efforts by the defendants to disguise the unlawful nature of this pyramid scheme through the use of innocent-sounding "Rules and Regulations" and other written materials that are directly at odds with the way the pyramid scheme is really operated and are intended to disguise the actual facts and the unlawful nature of that operation.

## JURISDICTION AND VENUE

3.      The Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332(d), because (a) at least one member of the putative class is a citizen of a state different from defendants, (b) the amount in controversy exceeds $5,000,000, exclusive of interests and

costs, and (c) none of the exceptions under that subsection applies to the instant action.

4.     This Court has jurisdiction over counts V and VI pursuant to 28 U.S.C. § 1331.

5.     This Court has jurisdiction over count V – for violation of section 10(b) of, and Rule 10b-5 under, the Securities Exchange Act of 1934 as amended, 15 U.S.C. § 78j(b) – under 15 U.S.C. § 78aa.

6.     This Court also has jurisdiction over count VI –  for violation of 15 U.S.C. § 77e and 15 U.S.C. § 77l –  under 15 U.S.C. § 77v.

7.     This court has supplemental jurisdiction over the remaining counts under 28 U.S.C. § 1367.

8.     Venue in this district is proper pursuant to 28 U.S.C. §1391(b).  In addition, venue is proper in this Court since the contracts at issue provide for venue here.

## THE PARTIES

### The Plaintiffs

9.     Plaintiff Marie Ackerman is a citizen of Illinois, and has resided in Arlington Heights, Illinois at all times relevant herein.  Ms. Ackerman signed a so-called "distributor" contract with Wellness on or about December 28, 2000 at Wellness's facility in Northbrook, Illinois and also attended numerous training seminars and other meetings conducted by the defendants and their agents at that facility.

10.     Plaintiffs Debra A. and Gerald J. Budner, husband and wife, are citizens of Illinois and have resided in Lombard, Illinois at all times relevant herein.  The Budners signed their distributor contract with Wellness on or about May 11, 2002 at Wellness's facility in Northbrook, Illinois and also attended numerous training seminars and other meetings conducted

by the defendants and their agents at that facility.

**The Defendants**

11.     Defendant Wellness is and at all times relevant herein was a limited partnership headquartered in Plano, Texas and organized under the laws of the State of Texas, and a citizen of Texas.  At all times relevant herein, Wellness operated an illegal pyramid scheme throughout the country, including in the State of Illinois, in violation of the criminal and civil laws of Illinois.  Throughout much of the period relevant herein, Wellness maintained a "Midwest Center" in Oak Brook, Illinois and conducted business at and from that facility, which business included, for instance, the holding of numerous seminars and other presentations for the solicitation of persons throughout the Midwest to become distributors, the signing of Wellness distributor contracts by such persons and for the training and instruction of new and existing distributors.  In recent years, the Oak Brook facility had been replaced by a similar facility in Northbrook, Illinois, and then later in Northfield, Illinois.

12.     Defendant WIN is a Colorado corporation with its principal place of business in Plano, Texas, and is a citizen of Texas.   WIN is and at all times relevant herein was the Managing General Partner of Wellness and had power and influence to direct and control significant aspects of Wellness's illegal pyramid scheme operations and did so, often through defendants Ralph and Cathy Oats.

13.      Defendant Ralph Oats, a Texas citzen, was the founder of Wellness and is and at all times relevant herein was the head of Wellness, controlling both it and defendant WIN, of which he is President.  Ralph Oats hosts many of the seminars designed to recruit distributors into the Wellness pyramid scheme, including several such seminars in Illinois and regularly

contributes to the quarterly newsletter that Wellness distributes to all of its distributors.  In the WIN System For Success Manual, a required purchase of every distributor, Ralph Oats is identified along with his wife Cathy Oats as "[t]he dominant force behind the explosive growth of WIN [and] an integral part of Wellness International Network."

14.     Defendant Cathy Oats, a Texas citizen, is the co-founder of Wellness and wife of defendant Ralph Oats and was at all times relevant herein Secretary of WIN.  Cathy Oats also speaks at Wellness seminars and presentations and regularly contributes to the quarterly newsletter that Wellness distributes to all of its distributors.  In the WIN System For Success Manual, a required purchase of every distributor, Cathy Oats is identified along with her husband Ralph Oats as "[t]he dominant force behind the explosive growth of WIN [and] an integral part of Wellness International Network."  Defendants Ralph Oats and Cathy Oats are referred to herein collectively as the Oats defendants.

15.     Defendant Sheri Matthews, a Texas resident, is and at all times relevant herein was Director of Distributor Relations and Compliance for Wellness.  Sheri Matthews was the Wellness official responsible for dealing with complaints of distributors and for denying the refund requests of disgruntled distributors.

## CONDUCT COMPLAINED OF

### Defendants' Illegal Pyramid Scheme

16.     While defendants tout Wellness as a legitimate MLM operation for the distribution of health and personal care products, the true structure and operation of Wellness is a classic –  and illegal –  pyramid scheme whereby, in exchange for money and other things of value, new recruits, deceptively referred to as a "distributors," acquire the opportunity to receive

supposed substantial "profits" primarily based upon the inducement of additional persons to participate and become distributors in the Wellness program and not primarily based on the volume or quantity of goods, services, or other property sold or distributed to persons for purposes of resale to consumers outside the Wellness program.

17.     That defendants' operation is an illegal pyramid scheme is shown by the following facts, among others:

A.     At seminars and meetings held for Wellness distributors and prospective distributors, the speakers, including Ralph and Cathy Oats and other agents of defendants, constantly and vigorously push the pyramiding aspects of the business, not retailing the product. For instance, defendants give distributors and prospective distributors a "Hypothetical Business Plan" geared toward the wonders of "geometric progression" – a fancy word for pyramiding – and then explain that that's precisely how they can get rich in the Wellness program: "*You introduce five referrals who introduce five others who introduce five others.*"   Indeed, in one of Wellness's quarterly newsletters provided to distributors, the purported success of one Wellness distributor is discussed:

> "Now nearly two years later, Kamal is applying the same drive and determination that catapulted him to success in his previous profession to his WIN business.  He has since become a familiar face among the company's monthly Top Producers, achieved earnings in excess of $45,000 in a single month, and now aspires to earn half a million dollars by the end of the year.  And with 11 people in his downline already qualified for the Cruise 2000, Kamal estimates his organizational sales volume to be nearing $4 million.  'I feel secure with the power of residual income and the continuing growth of my organization,' explains Kamal, who understands that geometric progression is a powerful force in network marketing.  'We didn't get the hundreds, we got a couple who went out and got a couple and got a couple.  Now we have hundreds.'" (Emphasis added.)

The focus is on "geometric progression" of new recruits and not selling products to retail

consumers outside the Wellness program.

B.      Ralph Oats admits in widely distributed Wellness videos ("WIN Opportunity

With Ralph Oats") that the Wellness operation is *not* about "selling.  In one such video he states:

> "What we're about is introducing products to people.  **We are not about selling.**
> We're using the opportunity to give products to people and those people can come
> back to the company and get their product.  So, **we're not about selling**, and that's
> what most people think it is, but that's not what it's about.  It's about sharing an
> opportunity to people based upon giving them the products first."

C.      Similarly, Ralph Oats told the audience at a July 2002 presentation in Rosemont,

Illinois that:

> "If you do not do the five step program[1] you will have to rely on selling.  And if that's
> the case, you are less likely to make any money.  Why would you want to rely on selling
> when doing the five step program and having those under you duplicate that, will make
> you wealthy?**"**

D.      Indeed, in the widely distributed videotape "Balanced Program - Ralph Oats,"

Ralph Oats explains that Wellness is not in the business of "product" sales to retail consumers

and instructs distributors to stay out of the "product business:"

> "I am telling you that all of you who are doing that [holding meetings to learn and
> inform about the products] are <u>guilty as sin of getting yourself set up in a product</u>

---

[1]  The "Five Step Program" is part of the WIN System For Success manual and is a guide
that details the five steps of giving product to a person and concludes not with a sale but with
signing them up as part of the pyramid:

> "After you have shared products and they are absolutely sold on the products,
> what's the next question they ask? 'How much does it cost?' "*Well, Tom and
> Mary, it depends.  Do you want to purchase at retail or wholesale?  The reason
> why I'm saying this is because there is an opportunity here for you to purchase
> these products at an immediate discount if you are interested.'*  Well, what do you
> think they are going to say ... '*No, John, I like to pay full price for everything*' ?
> You know they are not going to say that. They will say, '*Sure, tell me all about it.'*
> Just what you're waiting for, right?"

<u>business</u> and you guys and gals who are getting swept up in this thing to go and do all these product information meetings and all that, all that you are doing is meeting there and getting people excited about the product but you are not recruiting anybody and I will tell you why you are not recruiting anybody -- because you are laying the knowledge out on these people and they are going to buy the product and the next thing you know is that you are going to talk to them about the opportunity and they are just going to talk the product like they are supposed to talk the product.  <u>I am telling you in front of God, the camera and everyone that you are going about the business the wrong way.  You are getting swept up in product, product, product and I know that two or three people in this company are absolutely wearing out having [product] meetings with them and don't get paid for it.  Quit doing it.  Don't do it."</u>

E.    As a signed letter by Ralph Oats sent to distributors and potential distributors in the WIN Today quarterly newsletter for the Second Quarter of 2002 (Volume X) shows, the Wellness business is about getting paid on someone else's efforts to recruit new recruits:

"Believe me, I didn't get it at first.  In fact, when I walked into that room back in 1984, I went there to shoot holes through all their multi-level marketing theories because I thought I had all the answers.  But then <u>they offered me an opportunity to get paid on someone else's efforts</u> and I started to listen.  And I realized that, in order for our financial situation to turn around, we had to make a change.  Our future was up to us.  Well, I'd like to offer that same opportunity to you.  If you want to change what's going to happen in your life, you have to change.  Why not let WIN help you do it?" (Emphasis added.)

F.    The vast majority of Wellness product sales arise from new recruits joining the structure or between people already *insid*e the pyramid structure, but <u>not</u> to retail consumers in the general public outside the pyramid structure.

G.    The defendants' "WIN System For Success" manual includes four different scripts for distributors to use when they approach new prospects.  Not one of these scripts says one word about selling the product to the public; rather, the focus is strictly on "an exciting new business venture."

H.    Defendants engage in "inventory loading," the deceptive practice of directly or

indirectly inducing recruits to buy more products than they could ever sell, and well beyond their means. This occurs throughout the Wellness distribution system, and thus, the people at the top of the pyramid reap substantial profits, even though little or no product moves to market, while people at the bottom make excessive payments for inventory that simply accumulates in their basements or sits idle elsewhere. Defendants accomplish this by, *inter alia*, the following:

> (i)Distributors are required to "qualify" each of their distributorships each month in order to collect residual income. This means that each distributor must purchase from the defendants $3,000 to $5,000 worth of Wellness products each month, regardless of whether that distributor sold any of his/her products, before they will be paid for any of the efforts of distributors in their downline.

> (ii) Similarly, distributors are required to "pay to play," i.e., make a significant investment and/or to make ongoing purchases in order to qualify for bonuses, purchase discounts, and other rewards. Thus, defendants incorporate escalating incentives to purchase products (some at initial signup, some later) to qualify for ever-higher levels in the distributor hierarchy (often referred to as "ranks" and consisting of some seven different ranks ranging from the lowest --Associate Rank – to the highest, Presidential Leadership Council). The higher the rank, the higher the corresponding discounts on products purchased will be and the higher the bonuses and commission percentages will be. Distributors are encouraged to "pay to play" by making excessive payments for inventory, not for the purpose of resale to retail consumers but for the purpose of "buying into a high rank." In fact, defendants explicitly advise distributors to "Start at a rank where you can maximize your potential to earn money." This was an important part of the defendants' scheme because it allowed the defendants to collect large sums of money upfront that were not in any way based on or connected to sales of the Wellness products to the public.

I.      Perishable products are often shipped by defendants to distributors with already-expired "best used by"dates stamped on them (sometimes by a matter of years) demonstrating defendants' utter lack of concern with retail sales.

J.      The Wellness products are set at prices far in excess of real or fair market values or the prices of very similar products that are available over-the-counter in drug stores and pharmacies.  These products are priced in this manner because ultimate sales to retail consumers is not the goal, but rather are priced in this manner in order to support a large downline of Wellness distributors who merely buy and sell to each other.

K.      Defendants do not offer a mandatory "buy back" policy for the repurchase of merchandise when a distributor leaves the system, which is regularly since the system cannot sustain distributors.

L.      The number of levels a distributor may downline permitted an unsustainable chain of pyramiding , i.e. a distributor can recruit five distributors who each can recruit five more distributors, who each recruit five more distributors, geometrically and unsustainably expanding the pyramid.

M.      Defendants solicit and accept as distributors persons who have no basis, structure or experience for retailing Wellness products.

N.      Defendants have a policy and procedure by which distributors are required to conceal their *actual* commission earnings from prospective distributors, lest their false and deceptive representations be uncovered.

O.      Distributors were encouraged and taught not to sell products to retail customers but to use the products as a means of getting the "customers" to sign distributorship agreements to become members of the Wellness scheme.

P.      Because of the multitude of downline levels in the program, the Wellness compensation system was highly leveraged leading to an extreme inequality in payout to distributors.  While a few at the top who got in early enough might make some money, it is a

-10-

mathematical certainty that the vast majority of distributors, such as plaintiffs, will lose (and have lost) most, if not all, of the money they put into the Wellness program.

**The Defendants' Material Deceptions**

18.     In connection with the promotion, offer, sale and operation of the Wellness program, the defendants, directly and/or through others, intentionally made numerous misrepresentations and omissions, including, but not limited to, the following:

A.     That the Wellness operation is a legal MLM program, when, in fact, it is a criminal operation that violates and has violated the anti-pyramid-scheme law of Illinois and other states, as well as federal law.

B.     That distributors could make huge profits, without also disclosing the following:

(i)     that most Wellness distributors have lost money and quite a few of them have lost a great deal of money.

(ii)    that their actual chances of success were, in fact, minuscule;

(iii)   that in order to earn the touted commissions and bonuses, a distributor had to "qualify" each month, i.e., purchase an additional $3,000-$5,000 worth of products each month;

(iv)    that the vast majority of sales occur only between people <u>inside</u> the system or to new recruits joining the structure – not to retail consumers in the general public;

(v)     that the system is stacked in favor of a few people at the top at the expense of the many at the bottom;

(vi)    that it takes a very short time for a geographical or social community to be swamped with scheme members making it exceedingly difficult, if not impossible, to succeed, and that most markets were likely already saturated; and

(vii)   that at some point the pyramid must collapse since there cannot exist an endless supply of new recruits;

C.      That they could sell products to the general retail public and actually make money doing it when, in fact, their only possible chance at success would be to sign up many new recruits who would in turn sign up many more recruits.

D.      That WIN's products were "reasonably and competitively priced and market driven" when, in fact, the prices of products were not in line with fair market value and were utterly unattractive to bona fide retail consumers.

E.      That distributors are "compensated *only* for the generation of sales volume – not for sponsoring new distributors into the program," when, in fact, distributor profits came, if at all, primarily from bringing additional recruits into the Wellness program who were required or encouraged to purchase large amounts of product into *inventory* and not from *sale* to retail consumers.

F.      That numerous distributers had produced great profits, when in fact, most or all of them actually **lost** money.  Thus, for years defendants regularly published and promulgated and caused to be mailed to hundreds, if not thousands, of distributors and potential distributors a quarterly newsletter entitled <u>WIN TODAY</u> that contained false and fraudulent statements designed to induce persons to invest in Wellness as distributors, or to increase the amount of their investment.  Defendants Ralph and Cathy Oats are regular contributors to these newsletters and, plaintiffs believe, are ultimately responsible for the content of the newsletters.  The defendants caused these newsletters to be mailed in or about January, April, July and October of each year since at least sometime in 1998 and continuing to the present. Many, if not

all, of these quarterly newsletters omit material facts and contain deceptive and

fraudulent information described above, in addition to but not limited to the following:

> (i)  In Volume VIII of <u>WIN TODAY</u> (fourth quarter of
> 2000) distributor Waqar Khan is deceptively held out as
> a "Monthly Top Producer" for June 2000.  In fact, Dr.
> Khan only became a Wellness distributor on June 18,
> 2000 and did not earn *any* profit in that month; rather, at
> that time he <u>paid</u> Wellness over $250,000 for his
> distributorship.  Dr. Khan had never earned more than a
> very, very nominal amount of money from his work as a
> Wellness distributor.  In fact, Dr. Khan has lost <u>all</u> but
> $1,000 of the more than $265,000 he ultimately paid for
> his Wellness distributorship.  The defendants caused this
> newsletter to be mailed to plaintiff Marie Ackerman in
> or about January 2001 and also caused the same to be
> mailed to hundreds (if not thousands) of other Wellness
> distributors and other persons.

> (ii)  In Volume VI of <u>WIN TODAY</u> (fourth quarter of 1998),
> distributors Robert and Eunice Lange are deceptively held out as
> "**Top Producers Based on Personal/Group Retail Sales
> Volume**" who earned over $330,000.  In fact, Mr. Lange had
> <u>never</u> made any money as a Wellness distributor and, to the
> contrary, ended up losing a great deal of money as a distributor.

> (iii)  In Volume VIII of <u>WIN TODAY</u> (first quarter of 2000),
> distributors Abdul and Shaheen Rashid, Pratima Muzumdar and
> Ali and Abida Mustafa are all deceptively held out as "Top
> Newcomers Based on Personal Group Sales Volume in their
> Qualifying Month" for November 1999, December 1999 and
> January 2000, respectively.  The defendants caused this
> newsletter to be mailed in or about April 2000 to hundreds (if
> not thousands) of Wellness distributors and other persons.  The
> Rashids' distributor contract reflects that they did not sign-up
> into the program until December 4, 1999.

In fact, none of these distributors had made any money from their respective Wellness

distributorships.  To the contrary, <u>all of them</u> had lost a great deal of money because of

their association with Wellness.

**The Deceptive Rules & Regulations**

19.     Defendants attempted to disguise the unlawful nature of this pyramid scheme through the use of innocent-sounding "Rules and Regulations" and other written materials that are directly at odds with the way the pyramid scheme is really operated, and are intended to disguise the actual facts and the unlawful nature of that operation and are nothing more than window dressing intended to give the false impression that Wellness is a legal multilevel marketing scheme.

20.     For example, Rule F-2 provides:

> **"Stockpiling discouraged.**   The success of WIN depends on retail consumers; therefore all forms of stockpiling are discouraged.   WIN recognizes that distributors may wish to purchase products in reasonable amounts for their own use and for the purpose of provisioning new distributors as they are sponsored.   However, WIN strictly prohibits the purchase of products in unreasonable amounts solely for the purpose of qualification or advancement in the compensation plan."

However, the Wellness system did not depend on retail consumers at all and stockpiling was very much condoned and encouraged by the defendants.  Indeed, distributors were explicitly encouraged to, and did, purchase products from Wellness "solely for the purpose of qualification or advancement in the compensation plan." The deceptive Rules And Regulations were part of defendants' illegal scheme, to disguise the true nature of their illegal pyramid scheme.

21.     Moreover, plaintiffs and the other Class members were not told of the "qualification" amount referred to above in paragraphs 17 and 18 in the introductory seminars and presentations.  The need to reach the qualification amount each month is covered in the WIN System For Success manual, but the plaintiffs did not receive this

manual until two or three weeks after the distributor contract had been executed.

22.     Another deception in the defendants' scheme is the utter lack of

enforcement of the so-called "70 Percent Rule."  The presence of the 70 Percent Rule

in the Rules & Regulations is mere window dressing, deceptively intended to give the

appearance of a legitimate Mutli-Level-Marketing operation.  Rules F-4 and F-5

provided:

> **"70 Percent Rule.**   WIN strictly enforces the provisions of the product
> repurchases.  In order to purchase product from WIN, the distributor must
> certify on the product order form that he/she has sold, sampled (to induce
> sales to retail customers) or consumed at least 70 percent of all products
> previously purchased." Rule F-4

> **"70 Percent Rule Enforcement.**   WIN has adopted, implemented,
> maintained and enforced in its distribution system a policy and practice
> whereby WIN will require distributors to provide verification of their
> compliance with Rule F-4..." Rule F-5

23.     These Rules however were rarely, if ever, enforced, and certainly not on

any systematic basis.  They were mere window dressing to disguise their illegal

pyramid scheme.

24.     By reason of the foregoing facts, plaintiff Marie Ackerman lost

$52,841.23 and plaintiffs Debra and Gerald Budner lost $21,908.66, exclusive of

interest.

25.     By reason of the foregoing facts, the other Class members have been

damaged in respects substantially identical to that of the plaintiffs, although many of

the Class members have suffered much larger damages.

**The Proposed Class**

26.     All of the plaintiffs bring all of the counts stated in this action on their

own behalf and as the representatives of a class of persons described as follows:

> All persons who signed a Wellness distributor contract in Illinois and who
> suffered losses or damages as a result of their association with the Wellness
> operation.  Provided, however, that the following are excluded from this
> proposed Class: (i) any of the defendants, (ii) any relative or employee of
> any defendant, and (iii) any person who has on file an individual lawsuit
> against any of these defendants asserting claims similar to those asserted in
> this complaint.

**Class Allegations**

27.     The Class consists of hundreds, if not thousands, of individuals and

other entities, making joinder impractical, in satisfaction of Rule 23(a)(1).

28.     The claims of the representative plaintiffs (hereinafter the "plaintiffs")

are typical of the claims of all of the other Class members.

29.     The plaintiffs will fairly and adequately represent and protect the

interests of the  other Class members.  The plaintiffs have retained counsel with

substantial experience in prosecuting complex litigation and class actions.  The

plaintiffs and their counsel are committed to vigorously prosecuting this action on

behalf of the other Class members, and have the financial resources to do so.  Neither

the plaintiffs nor their counsel have any interests adverse to those of the other Class

members.

30.     Absent a class action, most Class members would find the cost of

litigating their claims to be prohibitive, and will have no effective remedy.  The class

treatment of common questions of law and fact is also superior to multiple individual

actions or piecemeal litigation in that it conserves the resources of the courts and the

litigants, and promotes consistency and efficiency of adjudication.

31.     The defendants have acted and failed to act on grounds generally applicable to the plaintiffs and the other Class members, requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class members.

32.     The factual and legal bases of all of the defendants' liability to the plaintiffs and to the other Class members are the same, resulting in injury to the plaintiffs and to all of the other Class members.  The Plaintiffs and other Class members have all suffered harm and damages as a result of all of the defendants' unlawful and wrongful conduct.

33.     There are many questions of law and fact common to the plaintiffs and the other  Class members, and those questions predominate over any questions that may affect individual Class members within the meaning of Rule 23(a)(2) and 23(b)(3).  Common questions include but are not limited to the following:

A.     Whether the Wellness program constitutes an illegal pyramid scheme in violation of the criminal law and/or civil law and/or public policy;

B.     Whether the distributor contracts signed by the plaintiffs and other Class members are void or invalid for violating the criminal law and/or civil law and/or public policy of Illinois and/or federal law;

C.     Whether false statements were made and material facts omitted in the promotion and sale of Wellness distributorships and the solicitation of persons to purchase such distributorships and/or to increase the amount to be invested in such distributorships;

D.     Whether the distributorships purchased by the plaintiffs and members of the proposed Class are investments in securities requiring the filing by the defendants of a registration statement with the Securities Exchange Commission pursuant to 15 U.S.C. § 77e;

E.     Whether all of the defendants have used the mails or other means of interstate transportation or communication to sell Wellness distributorships;

F.     Whether the defendants violated Sections 95 and 110 of the Illinois Business Opportunity Sales Law of 1995;

G.     Whether the plaintiffs and class members are entitled to rescission under the Illinois Business Opportunity Sales Law of 1995;

H.     Whether the defendants violated Section 6 of the Illinois Franchise Disclosure Act of 1987;

I.     Whether the plaintiffs and class members are entitled to rescission under the Illinois Franchise Disclosure Act of 1987;

J.     Whether defendants violated the Illinois Consumer Fraud and Deceptive Business Practices Act;

K.     Whether the plaintiffs and other Class members are entitled to compensatory damages;

L.     Whether, in light of all of the defendants' conduct, the plaintiffs and other Class members are entitled to punitive damages;

M.     Whether all of the defendants should be ordered to disgorge, for the benefit of the plaintiffs and other Class members, all or part of their ill-gotten profits, and/or to make full restitution to the plaintiffs and other Class members.

34.     A class action is superior to other available methods for the fair and

efficient adjudication of the controversy under Rule 23(b)(3).

**COUNT I**
**To Declare Plaintiffs' Contracts Void For**
**Violating Illinois Criminal Code and Public Policy**

35.     Plaintiffs reallege all of the foregoing paragraphs as though they were

set forth here in their entirely.

36.     720 ILCS 5/17-7 of the Illinois Criminal Code, at all times relevant

herein, has made "pyramid sales schemes" illegal and states:

(a)   The term "pyramid sales scheme" means any plan or operation
whereby a person, in exchange for money or other thing of value, acquires
the opportunity to receive a benefit or thing of value, which is primarily
based upon the inducement of additional persons, by himself or others,
regardless of number, to participate in the same plan or operation and is
not primarily contingent on the volume or quantity of goods, services, or
other property sold or distributed or to be sold or distributed to persons for
purposes of resale to consumers.  For purposes of this subsection, "money
or other thing of value" shall not include payments made for sales
demonstration equipment and materials furnished on a nonprofit basis for
use in making sales and not for resale.

(b)   Any person who knowingly sells, offers to sell, or attempts to sell
the right to participate in a pyramid sales scheme commits a Class A
misdemeanor.  720ILCS 5/17-7

37.     The Wellness operation described above is a "pyramid sales scheme"

within the meaning of this statute.

38.     In this connection, defendants' pyramid sales scheme contemplates

large number of ongoing violations of the Illinois statute quoted above, because the

scheme contemplates that all of its distributors will downline to others – and the

-19-

defendants knew and know that –  distributors in Illinois are most likely to downline

(i.e., recruit) and attempt to downline to persons in Illinois.

39.     By reason of the foregoing facts, the plaintiffs' distributor contracts are,

and at the time of their execution were, null and void as contrary to Illinois law and

public policy.

40.     Plaintiffs are entitled to rescission of the contracts plus actual damages.

**COUNT II**
**For Violation Of Illinois Consumer Fraud And**
**Deceptive Business Practices Act; 815 ILCS 505/1 *et seq.***

41.     Plaintiffs reallege all of the foregoing paragraphs as though they were

set forth here in their entirely.

42.     At all material times, there was in effect the Illinois Consumer Fraud

And Deceptive Trade Practices Act (815 ILCS 505/1 et seq.) (the "CFA").

43.     At all relevant times, Plaintiffs and Defendants were persons within the

meaning of section 1(c) of the CFA (815 ILCS 505/1(c)).

44.     At all relevant times Plaintiffs were consumers within the meaning of

section 1(e) of the CFA (815 ILCS 505/1(e)).

45.     At all relevant times, Defendants conducted trade and commerce within

the meaning of section 1(f) of the CFA (815 ILCS 505/1 (f)).

46.     At all relevant times, Defendants' trade and commerce included trade or

commerce directly or indirectly affecting the people of the State of Illinois.

47.     Section 2 of the CFA (815 ILCS 505/2) states:

Unfair methods of competition and unfair or deceptive
acts or practices, including but not limited to the use or
employment of any deception fraud, false pretense, false

promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act", approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby. In construing this section consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5 (a) of the Federal Trade Commission Act.

48.    Section 2A of the CFA (815 ILCS 505/2A) states:

It is an unlawful practice within the meaning of this Act for any person, by himself or through others, to sell, offer to sell, or attempt to sell the right to participate in a pyramid sales scheme.

49.    Section 1(g) of the CFA (815 ILCS 505/1g) provides as follows:

(g) The term "pyramid sales scheme" includes any plan or operation whereby a person in exchange for money or other thing of value acquires the opportunity to receive a benefit or thing of value, which is primarily based upon the inducement of additional persons, by himself or others, regardless of number, to participate in the same plan or operation and is not primarily contingent on the volume or quantity of goods, services, or other property sold or distributed or to be sold or distributed to persons for purposes of resale to consumers. For purposes of this subsection, "money or other thing of value" shall not include payments made for sales demonstration equipment and materials furnished on a nonprofit basis for use in making sales and not for resale.

50.    At all relevant times, defendants engaged in the "offer" and/or

"sale"and/or "attempted sale" of a "pyramid sales scheme" as those terms are defined

in Section 1 of the CFA (815 ILCS 505/1(g),(d)).

51.     By virtue of their conduct specified above, defendants violated Section

2 and 2A of the CFA, with the intent that plaintiffs would rely on such conduct, which

plaintiffs reasonably did, as a result of which they suffered substantial damage.

52.     Plaintiffs are entitled to injunctive relief, actual damages and their costs

of suit, plus reasonable attorneys' fees.

**COUNT III**
**Violation Of Illinois' Business**
**Opportunity Sales Law of 1995**

53.     Plaintiffs reallege all of the foregoing paragraphs as though they were

set forth here in their entirely.

54.     At all material times, there was in effect the Business Opportunity Sales

Law of 1995 (815 ILCS 602/1 et seq.) (the "BOSL").

55.     At all relevant times, defendants were "persons" within the meaning of

section 5 of the BOSL (815 ILCS 602/5-5.3).

56.     At all relevant times, defendants engaged in the "offer" and/or "sale" of

"business opportunities"as those terms are defined in section 5 of the BOSL (815 ILCS

705/5-5.10, 5-5.20).

57.     Section 5 of the BOSL (815 ILCS 602/5-95) states as follows:

(a)  It is unlawful for any person, in connection with the offer or
      sale of any business opportunity in this State or any offer or
      sale pursuant to the exemptions granted under subdivisions
      5-10(a), (c), (d), or (h), directly or indirectly:

     (1)  to employ any device, scheme or artifice to defraud;

     (2)  to make any untrue statement of a material fact  or
           to omit to state a material fact necessary in order to
           make the statements made, in the light of the
           circumstances under which they are made, not

-22-

misleading; or

(3) to engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person.

58. Section 5 of the BOSL (815 ILCS 602/5-110) further states:

It is unlawful for any person, in connection with the offer or sale of any business opportunity in this State, to publish, circulate or use any advertising which contains an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading.

59. By virtue of their conduct alleged above, defendants violated Sections 95 and 110 of the BOSL, with the intent that plaintiffs would rely on such conduct, which plaintiffs reasonably did, as a result of which they suffered substantial damage.

60. Under Section 125 of the BOSL, defendants are jointly and severally liable to plaintiffs.

61. Under Section 120 of the BOSL, plaintiffs are entitled to rescission, for recovery of all money or other valuable consideration paid for the business opportunity and for treble the actual damages, together with interest at 10% per annum from the date of sale, reasonable attorney's fees and court costs.

**COUNT IV**
**Illinois' Franchise Disclosure Act Violations**
**[Plead in the Alternative]**

62. Plaintiffs reallege all of the foregoing paragraphs as though they were set forth here in their entirely.

63. At all material times, there was in effect the Franchise Disclosure Act of 1987 (815 ILCS 705/1 et seq.) (the "Franchise Act").

-23-

64.     At all relevant times, defendants were "persons" within the meaning of section 3 of the Franchise Act (815 ILCS 705/3(7)).

65.     At all relevant times, defendants engaged in the "offer" and "sale" of "franchises"as those terms are defined in section 3 of the Franchise Act (815 ILCS 705/3(1), 3(9) and 3(12)).

66.     Section 6 of the Franchise Act (815 ILCS 705/6) states as follows:

In connection with the offer or sale of any franchise made in this State, it is unlawful for any person, directly or indirectly, to:

(a)   employ any device, scheme, or artifice to defraud;

(b)   make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or

(c)   engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

67.     By virtue of their conduct specified above, defendants violated Section 6 of the Franchise Disclosure Act, with the intent that plaintiffs would rely on such conduct, which plaintiffs reasonably did, as a result of which they suffered substantial damage.

68.     Defendants are jointly and severally liable to plaintiffs.

69.     Defendants failed to register their franchise program with the State of Illinois as required by the Franchise Act, and failed to give to plaintiffs and members of the Class the disclosure statement required by Section 5 of the Act.

70.     As a result of the conduct and omissions alleged in paragraph 69 above,

plaintiffs and all members of the Class are entitled to rescind their agreements with

defendants.

71.     Under Section 26 of the Franchise Act, plaintiffs are entitled to

rescission of the franchise agreements, actual damages, costs and attorneys fees.


**COUNT V**
**Section 10(b) of the Securities Exchange**
**Act of 1934, and Rule 10b-5 Thereunder**

72.     Plaintiffs reallege all of the foregoing paragraphs as though they were

set forth here in their entirely.

73.     The Wellness distributor contracts, as described above, constitute

investment securities within the meaning of, and regulated by, the Securities Exchange

Act of 1934, 15 U.S.C. § 78(c).

74.     By reason of their conduct alleged above, the defendants, severally and

in concert, directly and indirectly, participated in, aided and abetted one another, and

conspired with one another to participate and to aid and abet one another, in a

continuous course of conduct in connection with the purchase and sale of unregistered

and unqualified securities, in violation Section 10(b) of the Exchange Act, 15 U.S.C. §

78(j), and in contravention of Rule 10b-5 promulgated thereunder, 17 C.F.R.  §

240.10b-5, and, by use of the mails and other means and instruments of transportation

and communication in interstate commerce:

a.   Employed manipulative and deceptive devices, contrivances,

schemes and artifices to defraud the plaintiffs and the other Class members:

b.  Omitted to state material facts necessary in order to make the

statements made, in light of the circumstances under which they were made, not misleading; and

c.  Employed acts, practices and a course of business which operated or would operate as a fraud and deceit upon the plaintiffs and other Class members.

75.     The defendants knew and know that the devices, contrivances, schemes and artifices used to sell the said unregistered and unqualified securities were fraudulent and unlawful at the time they employed them, or employed them in reckless disregard thereof, and employed them for the purpose and with the intent to deceive and defraud and oppress the plaintiffs and other Class members, or in reckless disregard of their interests and the truth.

76.     Prior to 1999, defendants Ralph and Cathy Oats conspired, and entered into a conspiracy with persons unknown to the plaintiffs, to create and operate an unlawful and fraudulent pyramid sales scheme, as alleged herein.  Subsequent thereto, the defendants have conspired with each other, and with others, to market securities which were illegal and essentially worthless and fraudulently promoted them as legitimate investments when in fact they were not entitled to be placed on the market.

77.     The defendants also knew and know that the omissions of material fact referred to above created a misleading and deceitful situation at the time they were made or were made in reckless disregard thereof or with severe recklessness, and made them for the purpose and with the intent to deceive and defraud the plaintiffs and other Class members, or in reckless disregard of the plaintiffs' and other Class members' interests and of the truth.

78.     As a direct and proximate result of the foregoing, the plaintiffs and

other Class members have been induced by the defendants to purchase said securities, and have suffered substantial losses and damage to their business and property as is set forth above.

### COUNT VI
### For Violation Of 15 U.S.C. § § 77e
### and 77l of the Securities Act of 1933

79.     Plaintiffs reallege all of the foregoing paragraphs as though they were set forth here in their entirely.

80.     The monies that plaintiffs and other Class members paid to the defendants for their Wellness distributorships and products were investments in securities.

81.     In seminars and meetings with distributors and prospective distributors, defendants Ralph and Cathy Oats and the Illinois defendants as well as other Wellness representatives have referred to the money paid for distributorships and products as "investments" and to the distributors as "investors."

82.     None of the defendants has filed a registration statement for the sale of the distributorship securities as is required by 15 U.S.C. § 77e.

83.     As is set forth above, the defendants, directly and/or indirectly, have used instruments of transportation and communication in interstate commerce to sell Wellness distributorship securities to plaintiffs and other Class members.

84.     Plaintiffs Debra and Gerald Budner and Marie Ackerman and other members of the Class described above will tender their distributor contracts concurrently with the payment to them of the amounts provided for in 15 U.S.C. § 77l(b).

85.      As a direct and proximate result of the foregoing, plaintiffs Debra and Gerald Budner and Marie Ackerman and other members of the Class described above have sustained substantial losses and damage to their business and property as is set forth above.

## COUNT VII
## Unjust Enrichment

86.      Plaintiffs reallege all of the foregoing paragraphs as though they were set forth here in their entirely.

87.      Defendants have reaped millions of dollars in profits as a result of the wrongful conduct alleged herein, unjustly enriching themselves to the plaintiffs' detriment.

88.      Defendants' retention of these benefits violates fundamental principles of justice, equity and good conscience.

89.      Plaintiffs are entitled to disgorgement and a return of the monies unjustly obtained.

## RELIEF REQUESTED

WHEREFORE, the plaintiffs and other Class members pray for the following relief:

A.      For a judgment declaring the plaintiffs' and other Class members' distributor contracts with Wellness void or invalid from their inception, for an injunction prohibiting  the defendants and anyone allied with them in any way from seeking to enforce the terms of those contracts, and for a rescission of the contracts;

B.      For a money judgment against the defendants, jointly and severally, in

the amount of Class members' damages and expenses stemming from or relating to their involvement in the unlawful Wellness pyramid scheme;

C.        For punitive damages in an appropriate amount to be included in the money judgment entered for each plaintiff and other Class members;

D.        For plaintiffs' attorneys fees and costs and expenses of this and related litigation;

E.        For pre- and post- judgement interest; and

F.        For such other relief as may be necessary or proper to make the plaintiffs and other Class members whole and to fully compensate them for their damages and losses, actual and potential, relating to the unlawful Wellness pyramid scheme.

## **JURY DEMAND**

Plaintiffs request trial by jury of all claims that can be so tried.

Respectfully submitted,


By s/ Roger F. Claxton
    Roger F. Claxton
    Texas Bar No. 04329000
    Robert J. Hill
    Texas Bar No. 09652100
    CLAXTON & HILL, PLLC
    3131 McKinney Avenue, Suite 700
    Dallas, Texas 75204
    (214) 969-9029
    Fax: (214) 953-0583

John G. Jacobs, Esq.
Bryan G. Kolton, Esq.
THE JACOBS LAW FIRM, CHTD.
122 South Michigan Avenue
Suite 1850
Chicago, Illinois 60603
(312) 427-4000
Fax: (312) 427-1850

## CERTIFICATE OF SERVICE

The undersigned attorney herewith certifies that a true and correct copy of the foregoing document was delivered by messenger to counsel for defendants listed below on the 21st day of April, 2006.

John F. Martin
Gruber Hurst Johansen Hail
1445 Ross Avenue, Suite 4800
Dallas, Texas 75202

s/ Roger F. Claxton
Roger F. Claxton